**William WEISS, Claimant,**

v.

**SECURITY STORAGE COMPANY, Employer.**

Superior Court of Delaware, New Castle.

Nov. 20, 1970.

**112**

Bruce M. Stargatt and William F. Taylor, of Young, Conaway, Stargatt & Taylor, Wilmington, for claimant.

William Prickett, of Prickett, Ward, Burt & Sanders, Wilmington, for employer.

STIFTEL, President Judge.

On May 10, 1969, William Weiss (Weiss) was injured in a fall from the roof of a building at Security Storage Company, which he was dismantling. Before the Industrial Accident Board, on January 16, 1970, there was a dispute as to whether he was working as an employee of Security at the time of the accident. The Board held that Weiss was an employee at the time of the accident and awarded compensation. Security appeals.

William Weiss had been employed by Security Storage Company (Security) since 1963. He was a lease driver for Security as an agent for Allied Van Lines. In that capacity, he was engaged in long distance hauling. Weiss was not on salary but rather was paid a commission on the goods hauled according to a complex commission system in effect between Allied Van Lines and Security.

When Weiss was not engaged in the above described "over the road" hauling, he and other lease drivers similarly situated worked as laborers for Security at the prevailing union hourly rate. Interim work was actively promoted by Security in an effort to provide employment to the non-active lease drivers, in order to help them supplement their income; and also, to make temporary warehouse help available. Weiss indicated that he did not consider this extra work to be his "regular job". Payment for these latter services was usually by check or cash.

From mid-April, 1969 until May, 1969, the claimant was under a suspension by Allied Van Lines for 30 days. Since Security acted as an agent of Allied, it was possible for drivers suspended by Allied to remain active as employees of Security.

In May, 1969, Security was engaged in an expansion program. During that time, claimant learned that as a result of the planned expansion, it would be necessary to remove three of five sections of a corrugated metal storage building located in Security's yard. The shed, itself, consisted of large sheets of corrugated metal, bolted together. Dismantling the shed involved unbolting and removing three large metal sheets.

Security's President, Robert Joslin (Joslin) had discussed the removal of the shed with the general contractor, Frank Dougherty. Weiss, himself, became interested in obtaining the metal sheets for use on his Pennsylvania farm. Weiss on several occasions approached Joslin offering to dismantle the shed. After Weiss had taken a few panels off to see what procedure might be followed, Joslin concluded that it was a simple nuts and bolts type of operation. Joslin and Weiss subsequently entered into what Joslin considered to be a binding oral agreement whereby Weiss would take down the building in return for the salvage.

During the week prior to the accident, Weiss was told by Joslin what portion of the shed was to be dismantled and what

portion was to be left standing. Specifically, bays Nos. 1, 2 and 3 were to be removed by Weiss on Saturday, May 10, 1969. At the same time while Weiss was deciding the method of dismantling to be used, his brother, Calvin Weiss (Calvin), who was a warehouse foreman for Security, was seeing to it that miscellaneous things were moved from the bays, scheduled to be dismantled. Joslin understood that Calvin would assist Weiss in the dismantling of the structure on Saturday, but not during normal working hours.

Joslin indicated that he supervised in the planning stage of the operation. As a result of this planning, a procedure of dismantling was decided upon. Joslin said that Weiss was permitted to use any and all of Security's equipment that was necessary.

Weiss was to be assisted on May 10, 1969, by Calvin, by Calvin's son-in-law, and by Weiss' two sons. Joslin at no time agreed to pay Weiss any salary or other monetary remuneration for razing the building and did not in fact pay any money to Weiss. Further Joslin did not agree to pay or actually pay any wages for work done to dismantle the shed to any of Weiss' helpers. In short, Security's wage records show that no-one in Weiss' crew was paid any money for Saturday, May 10, 1969, or for any labor connected with the actual dismantling of the shed.

Calvin testified that Joslin gave Weiss permission to remove the shed on May 7, 1969. Weiss worked for two days before the accident without any extra help. Weiss took down siding from the metal shed which he could reach from the ground or from a chain lift.

On Saturday, May 10, 1969, Mr. Weiss arrived on Security's premises accompanied by his brother, Calvin, his son-in-law Husty, and Weiss' two sons who were going to help him dismantle the shed. Weiss and his sons spent the night before in the cab of a Security trailer.

At no time during the three days was there any on-the-job supervision by Mr. Joslin or other person in supervisory capacity. Calvin had keys to the Security warehouse and opened the building so they could get a fork lift truck and other miscellaneous tools. Aside from helping Weiss, Calvin had no particular duties which could have required his presence at the warehouse that day. Weiss had backed a trailer that belonged to Security alongside of the shed so that they would have a platform on which to work.

Finally, testimony is undisputed that Robert Joslin, the President and Treasurer of Security Storage, considered the claimant to be acting as an employee of Security while dismantling the shed and that Weiss was working subject to Joslin's right to control and direct the project.

The Board held that Weiss was an employee at the time of his injury within the meaning of 19 Del.C. § 2301. The Board listed four reasons for its holding, as follows:

(a) That Weiss "received compensation (salvage) for this work from his employer";

(b) That Weiss "used the employer's equipment in the course of this work * * *";

(c) That Weiss "was hired by the employer for the work * * *";

(d) And, most importantly, "the Board places major emphasis on the testimony of Robert Joslin, the President of the Company, who said that he (Joslin) had the right to control and direct the work of the claimant in dismantling the building if he desired." (IAB Opinion, pp. 4–5).

The question for this Court is whether there is substantial evidence in the record from which the Board's conclusions could have been fairly and reasonably drawn. Johnson v. Chrysler Corporation, 213 A.2d 64 (Del.Supr.).

"Employee" is defined in 19 Del.C. § 2301, as:

" * * * Every person in service of any corporation (private, public, municipal or quasi-public), association, firm or person (excepting the employees excluded by this sub-chapter) under any contract of hire, express or implied, oral or written, or performing services for a valuable consideration * * *."

The definition is meant to exclude those relationships of principal and agent referred to as independent contractors. Gooden v. Mitchell, 2 Terry 301, 21 A.2d 197, sets forth the rules and criteria to be applied in deciding whether one is an employee or an independent contractor. In *Gooden*, the Court, citing Alexander v. R. A. Sherman's Sons Co., 86 Conn. 292, 85 A. 514; 21 Words and Phrases, Perm. Ed. 12, 27 Am.Jur. 481, indicated that the term "independent contractor", is usually applied to one who is contracted to do work in an independent manner; that is, accountable only as to the results obtained and is not subject to the control or supervision of the employer. The Court stated:

"There are other well recognized and fairly typical indicia of the status of an independent contractor; that is, a contractor's obligation to furnish his tools, supplies, materials used in the work, the element of time of said employment, the method of payment, whether the work is part of the regular business of the employer, and whether or not the employer has the privilege to terminate the same at his convenience or command.

* * * * * *

"In connection with what I have just said, it must be recognized as a practical proposition that under every contract requiring work to be done the employer reserves a certain amount of control. For instance, at all times the employer reserves the right to see that the contract to be performed is performed according to designated specifications. Such a control or exercise over the work to be performed would not necessarily render an independent contractor a mere employee, as the relationship of employer and employee is not deductible from a reservation of power which does not take away from the contractor his right to perform the contract according to his own ideas, as long as his work in completing the contract is consistent with the terms and specifications thereof. 27 Am.Jr. 488.

"The test most indicative as to whether or not a person is an independent contractor, or an employee, lies in the control of the work which is reserved by the employer. It is not necessarily the exercise of control or interference by the employer, but the existence of the right of control or to interfer, which renders one an employee rather than an independent contractor."

The *Gooden* criterion has been the substance of the test of the relationship in other Delaware decisions. Richardson v. John T. Hardy & Son, Inc., 4 Storey 561, 54 Del. 567, 182 A.2d 901; Lester C. Newton Trucking Co. v. Neal, 204 A.2d 393 (Del.Supr.). The Court in the Newton case stated:

"Ordinarily there are four elements which may be taken into consideration in answering the question of whether or not the relationship of employer and employee exists. These are (1) who hired the employee; (2) who may discharge the employee; (3) who pays the employee wages; and (4) who has the power to control."

The Court continued, however,

"In the *Richardson* case we pointed out that whether or not an employer-employee relationship exists is always determined by the particular facts and circumstances of the case, but that in the last analysis the question is almost exclusively determined by the fact of which possible employer has the right to control and direct the activities of the em-

ployee in the performance of the act which caused his injury."

In 1 Larson's Workmen's Compensation, § 44.00, the author states:

"The traditional test of the employer-employee relationship is the right of the employer to control the details of the work * * * if the right of control of details goes no further than is necessary to insure a satisfactory end result, it does not establish employment."

See, also, Restatement of Agency 2d 220 (2).

The following are the factors which the Board had a right to consider in arriving at its finding.

■ Joslin, Security's President, testified that after the accident he told Weiss that he was covered by Workmen's Compensation. Further, he stated that he considered Weiss a Security employee at the time of the accident. These admissions by Security cannot be taken lightly as defendant suggests. While it is true that belief as to the existence of the relationship is not determinative, it is a factor to be considered, since said belief is indicative of an assumption of control. Restatement of Agency 2d § 220, Comment on Subsection 2(m). Similar statements expressing intention have been held to be declarations against interest and binding on the employer. O'Boyle v. Harry Seitz & Sons, 105 Pa.Super. 135, 160 A. 145. In O'Boyle, an employer's statements that Workmen's Compensation would take care of claimant and that claimant was hurt in the course of work, warranted a finding that the accident occurred in the course of employment. While Joslin's testimony that he had control and his representation to Weiss that he was covered by Workmen's Compensation, while not dispositive of the case, is nevertheless a factor that the Board had a right to consider along with other relevant facts.

Another element which supports a finding of an employer-employee relationship is the fact that Security furnished all the equipment for doing this job. Usually, when the employer furnishes valuable equipment, the relationship is "almost invariably" that of employer-employee. Restatement of Agency 2d § 220(c) and 1 (a), Larson's Workmen's Compensation § 44.34. The reason is explained in Larson's at § 44.34 as follows:

"In applying the test of who furnishes equipment, it is essential to bear in mind the rationale underlying the test. When it is the employer who furnishes the equipment, the inference of right of control is a matter of common sense and business * * * Moreover, since he has capital tied up in this piece of equipment, he will also want to ensure that it is kept productive and busy as possible."

Weiss said that he was told he could use "any and all" equipment that Security had. Weiss was permitted the use of a Security trailer, which was moved into position under the edge of the roof of the building to be used as a work platform. A security fork-lift mechanical truck was used to carry materials, while also doubling as a portable platform to reach difficult areas. A Security machine for banding together the sheets was used. Hand tools for removing the sheeting from the framework were also supplied by Security. It is readily apparent that the Board was justified in considering the above stated facts as relevant factors in support of a finding of an employer-employee relationship.

■ Employer's argument that an independent contractor relationship existed because Weiss was being compensated, namely by salvage, on a "completed project basis" is not controlling. It is not proper to find simply because the nature of compensation necessitates a receipt of consideration at the completion of the job, instead of being paid at an hourly rate, that the relationship of employer-employee is negated as a matter of law. Payment on

a "completed project basis" while indicative of an independent contractor relationship, is not of itself conclusive. 1(a) Larson's Workmen's Compensation § 44.-33, n. 84. The Board, therefore, had a right to find that Weiss was an employee of Security and being compensated as such by the receipt of salvage.

The Board also found that Weiss was hired by the employer for the work. The evidence is clear that Weiss did, in fact, approach Joslin and offered to perform the task of dismantling the shed, in return for the salvage value. The fact that Weiss sought out this extra employment is not dispositive of either contention. The evidence indicates, and the Board was justified in finding, that Joslin did give Weiss employment other than truck driving, which was not uncommon practice in the case of their truck drivers when they were not out on the road.

While it is true that Joslin testified that he believed he would be going back on a gentlemen's agreement if he gave the dismantling job to an independent contractor, the fact remains that all instances of these part-time jobs could be viewed as independent gentlemen's agreements. This does not, however, preclude the relationship of employer-employee.

In Mr. Joslin's own view, he not only hired Weiss, but he had the right to control and direct the work that was being done if he desired to exercise that right. While Joslin did not direct the actual work on the day of the injury, he did indicate to Weiss how the work was to proceed. He actually supervised the work in the beginning until he was satisfied as to the procedure to be followed. He told Weiss where to start, directed that the first three sections be dismantled and that the remaining two sections be left intact. Weiss indicated that whatever Joslin suggested would be controlling to Weiss.

The Board had every right to believe this evidence. For this reason, I conclude that the Board did rely on substantial evidence on which to base its award.

The award of the Industrial Accident Board is affirmed.

It is so ordered.